UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

EUGENIO GARDUNO GUEVARA,  )
           )
    Plaintiff,    )
           )
v.           )  No.: 3:15-CV-548-TAV-CCS
           )
ALMA SOTO SOTO    )
           )
    Defendant.   )

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on plaintiff Eugenio Garduno Guevara's Verified Petition for Return of Child to Mexico and for Immediate Issuance of Show Cause Order to Respondent [Doc. 1]. In this petition, plaintiff requests the Court to issue an order directing the prompt return of his child to Mexico so that country may determine the parties' underlying custody dispute [*Id.* ¶¶ 30–34]. Upon agreement of the parties, the Court entered a restraining order in this case that preserved the status quo pending resolution of the matter [Docs. 5, 10]. Thereafter, defendant filed an answer to plaintiff's complaint [Doc. 12]. The Court held an evidentiary hearing on March 7, 2016, and the parties filed post-trial briefs [Docs. 17, 18]. Upon consideration of the parties' arguments, the evidence introduced into the record, and the relevant law, the Court grants plaintiff's petition for the return of his child to Mexico.

## I.    Background[1]

This litigation relates to the alleged wrongful retention of plaintiff's child (hereinafter "the child") in the United States by the child's mother, defendant Alma Soto Soto [Doc. 1]. Plaintiff states that he, defendant, and the child are all citizens of Mexico [*Id.* ¶ 5]. When the child was born in Queretaro, Mexico on October 24, 2010,[2] plaintiff and defendant were living together after participating in a religious ceremony referred to as a "free union," but were not legally married [*Id.* ¶¶ 6, 7; Tr. at 26:6–7]. They lived in Coroneo, Guanajuato, Mexico until March 2013, when plaintiff and defendant separated [Doc. 1 ¶ 8].[3] Plaintiff ended his relationship with defendant because of their "strong arguments," to which he did not believe the child should be exposed [Tr. at 44:22–45:3].

At trial, the parties painted differing pictures of their relationships with each other and with the child. Defendant submits that her relationship with plaintiff was marred by "[m]ostly verbal" mistreatment, but that plaintiff would also push and slap defendant when he was drunk [*Id.* at 119:7–120:13]. She stated that within eight days of the child's birth, plaintiff "was back with his friends, with women, drinking" [*Id.*]. She submitted

---

[1] The following facts are compiled from those submitted in the complaint and answer, as well as from the evidence presented at the evidentiary hearing held on March 7, 2016. The Court has cited to portions of the hearing transcript, but, in the interest of deciding this matter expeditiously, the Court will render its opinion without receiving an official transcript from the Court Reporter.

[2] At trial, defendant stated that her son was born in October 2011, but defendant admitted in her answer to plaintiff's petition that her son was born in October 2010, and the child's birth certificate states October 24, 2010 [Pl.'s Ex. 2], which defendant admitted was correct [Trial Transcript ("Tr.") at 134:1–20]. Accordingly, the Court presumes the child was born in 2010.

[3] Defendant submits that plaintiff kicked her and the child out of his house [Tr. at 120:14–25].

2

that plaintiff would consume alcohol every weekend [*Id.* at 121:12–14], and that he would use drugs, although she did not know the name of the drugs [*Id.* at 122:8–12]. Plaintiff testified, on the other hand, that he never had problems with alcohol or drugs, that he only drank alcohol at family gatherings (as would defendant), that he was never physically abusive to defendant or the child, and that he never screamed at defendant [*Id.* at 45:6–15, 66:14–23].

While plaintiff alleges that he spent his free time outside of work with the child, bathed him, helped get him dressed for the day, changed his diapers, and brought him to doctor's appointments [*Id.* at 27:20–30:25], defendant submits that he did not [*Id.* at 121:15–122:3].

At that time of the parties' separation, defendant and the child moved approximately twenty minutes away from plaintiff's house to Michoacán, Mexico to live with defendant's parents and maternal grandmother [Doc. 1 ¶ 9]. Plaintiff states that he and defendant reached an agreement regarding his visitation rights with the child, in which they agreed that plaintiff would visit with the child on weekends and would provide defendant with approximately half of his income in financial support each week, along with portions of meat and powdered milk [*Id.* at 45:19–47:25].

Defendant denies that they reached a visitation agreement, and disputes the amount of support defendant provided for the child upon their separation [*Id.* at 123:25–124:3]. She states that plaintiff visited with the child on four separate occasions—

including one overnight visit—after she moved into her parents' house, before she traveled to the United States [*Id.* at 124:20–125:5; Doc. 18 p. 5].

On April 13, 2013, defendant picked up the child from plaintiff's home, and thereafter plaintiff was unable to find or reach defendant or the child [Doc. 1 ¶ 11]. Plaintiff alleges he went to defendant's residence to find her, and tried to call her cell phone, but to no avail [*Id.* ¶¶ 12–13]. In an effort to find defendant and the child, plaintiff initiated proceedings in Coroneo, Guanajuato, Mexico, filed a police report in Michoacan, Mexico, and attempted to obtain assistance from the Mexican government in locating defendant and the child [Docs. 1 ¶¶ 14–16; 1-5; 1-6]. Unbeknownst to plaintiff, defendant had illegally moved with the child to the United States [Tr. at 126:14–22, 133:10–11].

In July 2014, plaintiff alleges he located defendant and the child in Wichita Falls, Texas[4] with defendant's brother, after he saw a photograph of defendant and her brother on Facebook [Doc. 1 ¶ 17]. In April 2015, plaintiff filed an Application for Return of the Child with the Mexican Central Authority, and the United States Department of State wrote a letter to defendant, asking her to voluntarily return the child to Mexico [Docs. 1 ¶¶ 18–19; 1-7; 1-8]. Plaintiff states that, upon information and belief, defendant did not respond to this letter [Doc. 1 ¶ 19].

---

[4] At the hearing, defendant stated that the photograph was taken in Gatlinburg, Tennessee [Tr. at 127:14–15]. The Court notes that it does not have an opinion as to where the photograph was actually taken, and only includes this fact as background for how plaintiff eventually located defendant.

On May 28, 2015, defendant filed a Petition to Determine Custody in the Juvenile Court for Knox County, Tennessee [*Id.* ¶ 20, Doc. 1-9].  The United States Department of State subsequently sent a letter to the presiding judge in that case to inform the judge that Article 16 of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 (July 1, 1988) (hereinafter "Hague Convention"), described *infra* Section II, does not permit courts to decide on the merits the rights of custody until it has been determined that the child should not be returned to Mexico under the Hague Convention [Docs. 1 ¶ 21; 1-10].

Plaintiff then filed a verified complaint in this Court on December 11, 2015, asserting a cause of action under the Hague Convention, in which he ultimately seeks for the child to be returned to Mexico [Doc. 1].  On December 29, 2015, the Court issued a temporary restraining order in which it enjoined defendant from taking any action to remove the child from the Court's jurisdiction, and ordered the parties to appear for a hearing on January 12, 2016 [Doc. 5 p. 15].

In this order, the Court advised the parties that, pursuant to Federal Rule of Civil Procedure 65(a)(2), and as is common in proceedings under the Hague Convention, the Court "may advance the trial on the merits and consolidate it with the [preliminary injunction] hearing" [*Id.* (citing Fed. R. Civ. P. 65(a)(2))].  *See, e.g.*, *Mendoza v. Silva*, 987 F. Supp. 2d 883, 888 (N.D. Iowa 2013) (consolidating the preliminary injunction hearing with a hearing on the merits); *Rocha v. Florez*, No. 2:14-CV-00051-RCJ, 2014

WL 317779, at *6 (D. Nev. Jan. 28, 2014) (ordering a consolidated preliminary junction hearing with a hearing on the merits).

Thereafter, the United States Marshals Service personally served defendant with plaintiff's Verified Complaint and the Court's Temporary Restraining Order [Doc. 6]. The Court held a hearing on January 12, 2016, in which, upon agreement of the parties, it ordered that the terms of the temporary restraining order would remain in full force and effect pending resolution of the matter [Doc. 10]. Defendant then replied to the complaint [Doc. 12]. On March 7, 2016, the Court held an evidentiary hearing in this matter in which plaintiff and his mother, Silvestra Guevara, testified for plaintiff, and defendant and her mother, Leonor Soto Soto, testified for defendant [Doc. 16].

At the trial, defendant testified that the child attends church in the United States every weekend; that he enjoys playing football, going to the park, jumping on a trampoline, and skiing; and that he sees his extended family frequently [Tr. at 128:14–130:4]. She also testified that she has registered him to begin kindergarten in the fall [*Id.* at 130:12–18]. Defendant stated that she would be afraid to return to Mexico with the child, due to the crime in the area, and because plaintiff's family is wealthy and has influence [*Id.* at 128:11–13, 131:19–132:6].

Following the hearing, the parties filed post-trial closing briefs [Docs. 17, 18]. In his brief, plaintiff alleges that the child's habitual residence is Mexico, that plaintiff has custody rights under Mexican law that he was actually exercising, that plaintiff did not consent or acquiesce to the child being moved to the United States, that the child has not

become settled in the United States, and that the child is not at grave risk if returned to Mexico [Doc. 17]. Plaintiff submits that, even if defendant is successful in proving an affirmative defense in this case, the aims of the Hague Convention support returning the child to Mexico [*Id.*].

In her post-trial brief, defendant alleges that plaintiff has not proven his custody rights under Mexican law or that he was actually exercising custody, that the child is now settled in the United States, that plaintiff acquiesced to the child remaining in the United States, and that the child would be placed in an "intolerable" situation if returned to Mexico [Doc. 18]. Defendant submits that, at the time of the hearing, the child had spent just over half of his life in the United States [*Id.* at 7].

## II.    The International Child Abduction Remedies Act

Plaintiff's verified complaint arises under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011 (2015),[5] which is a codification of the Hague Convention. *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001). The Hague Convention attempts to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, pmbl.; *March*, 249 F.3d at 465. The Hague Convention's objectives are "to secure the prompt return of children wrongfully removed or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of the

---

[5] Formerly codified at 42 U.S.C. §§ 11601–11610 (2000).

7

Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1; *McKie v. Jude*, No. CIV. A. 10-103-DLB, 2011 WL 53058, at *4 (E.D. Ky. Jan. 7, 2011). *See also Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1228 (2014) (describing the Hague Convention's "central operating feature" as being the return of the child). Mexico and the United States are signatories to the Hague Convention. *Basil v. Ibis Aida de Teresa Sosa*, No. 8:07-CV-918-T-27TGW, 2007 WL 2264599, at *3 (M.D. Fla. Aug. 6, 2007).

ICARA grants state and federal district courts concurrent jurisdiction over claims arising under the Hague Convention. 22 U.S.C. § 9003(a). The ICARA prohibits courts from making a final determination as to the child's custody; courts instead only determine which country should try the underlying custody dispute. *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996) (citing Hague Convention, art. 19).

The Sixth Circuit has stated that the ICARA does not expressly require an evidentiary hearing, or even discovery, in these cases. *March*, 249 F.3d at 474; *see also Sinclair v. Sinclair*, 121 F.3d 709, 1997 WL 428897, at *1 (6th Cir. Jul. 30, 1997) (upholding the district court's decision to not hear testimony from two important defense witnesses before rendering a judgment). It has described the Hague Convention as being a "unique treaty," and has emphasized the "emergency nature of these cases," that require speedy and immediate resolutions. *Id.*; *see also Norinder v. Fuentes*, 657 F.3d 526, 533 (7th Cir. 2011) (concurring with the Sixth Circuit's conclusion that "an expedited schedule is appropriate" in these petitions).

8

Pursuant to the ICARA, plaintiff has the burden of demonstrating by a preponderance of the evidence that the child was "wrongfully removed or retained in breach of his custody rights under the laws of the Contracting State" in which the child "habitually resided" before he was removed or retained. 22 U.S.C. § 9003(e)(1); Hague Convention, arts. 3, 12; *March*, 249 F.3d at 465–66. If plaintiff is able to demonstrate that the child was wrongfully removed from its habitual residence, then the child must be returned to the country of the child's habitual residence for a custody determination, unless defendant can establish that she is able to meet certain exceptions under ICARA. Hague Convention, arts. 12, 13, 20.

These exceptions require defendant to demonstrate: (1) by a preponderance of the evidence that the instant proceeding was commenced more than one year after the child was removed or retained, and that the child has become settled in its his new environment, Hague Convention, art. 12; (2) by a preponderance of the evidence that plaintiff consented to or subsequently acquiesced in the child's removal or retention, Hague Convention, art. 13(a); (3) by clear and convincing evidence that there is a grave risk that returning the child would expose him to physical or psychological harm, Hague Convention, art. 13(b); or (4) by clear and convincing evidence that returning the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," Hague Convention, art. 20.; 22 U.S.C. § 9003(e); *Friedrich*, 78 F.3d at 1067.

Despite these exceptions, the Sixth Circuit has stated that the Hague Convention "is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Panteleris v. Panteleris*, 601 F. App'x 345, 347 (6th Cir. 2015) (citing *Friedrich*, 78 F.3d at 1064). In keeping with the Hague Convention's primary aims, the Sixth Circuit has described these exceptions as "narrow," and has noted that federal courts continue to retain the discretion to return the child "despite the existence of a defense, if return would further the aims of the Convention." *Friedrich*, 78 F.3d at 1067. It stated that federal courts "should use [that power] when appropriate," and that these exceptions "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Id.* The Hague Convention itself notes that a court has the authority to order a child to be returned at *any* time, and the Supreme Court has described how any applicable exceptions merely "open[ ] the door" for the Court to consider other factors in deciding whether to return the child. Hague Convention, art. 18; *Lozano*, 134 S. Ct. at 1234-35.

## III. Analysis

In his petition for the child to be returned to Mexico, plaintiff maintains that the child was wrongfully removed from Mexico, where the child was a habitual resident, in breach of defendant's custody rights, which he was actually exercising prior to the child's removal [Doc. 1 ¶¶ 24–26]. Defendant disputes plaintiff's allegations, and also submits that the following applicable exceptions weigh in favor of having the child remain in the

10

United States: (1) plaintiff acquiesced to the child being removed to the United States; (2) the child is now settled in the United States; and (3) that the child will be placed at grave risk if returned to Mexico [Doc. 18].

### A.      Wrongful Removal or Retention

To state a successful claim under the Hague Convention, plaintiff must establish by a preponderance of the evidence his child's removal was wrongful, as defined by the Hague Convention.  22 U.S.C. § 9003(e)(1).  Wrongful removal involves taking the child "from the person who was actually exercising custody of the child," and wrongful retention involves "keeping the child without the consent of the person who was actually exercising custody."  *March v. Levine*, 136 F. Supp. 2d 831, 835 (M.D. Tenn. 2000) (citing 51 Fed. Reg. 10494, 10503 (1986) (Hague International Child Abduction Convention: Text and Legal Analysis)).

One of the main purposes of the ICARA is to prevent parents from removing children from the country of their habitual residence to a more sympathetic court in order to have a "home court advantage" in custody determinations.  *Id.* at 836.  Accordingly, in order to determine whether the child was wrongfully removed, plaintiff must first demonstrate that the child was removed from the country of his habitual residence. Plaintiff must then establish by a preponderance of the evidence that the child's removal was in breach of plaintiff's custody rights pursuant to the laws of the country of the child's habitual residence, and that plaintiff was actually exercising those custody rights. Hague Convention, art. 3; *Friedrich*, 78 F.3d at 1064–66; *March*, 136 F. Supp. 2d at 842.

As the Sixth Circuit has cautioned, if the Court finds that plaintiff was actually exercising custody rights over the child, its inquiry "should stop—completely avoiding the question of whether the parent exercised the custody rights well or badly." *Friedrich*, 78 F.3d at 1066.

### 1.    Habitual Residence

The Court will first consider whether the child was removed or retained away from the country in which the child was a habitual resident immediately before the removal or retention.  While the Hague Convention does not define the term "habitual residence," the Sixth Circuit has stated that a child's habitual residence is the country where, at the time of the removal or retention, "the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'"  *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (quoting *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007)).

Here, the evidence demonstrates that the child habitually resided in Mexico immediately preceding the child's removal to the United States.  Plaintiff, defendant, and the child are all citizens of Mexico and lived in Mexico from the time of the child's birth in October 2010 through April 13, 2013.  No evidence suggests that the child had lived anywhere but Mexico prior to being removed to the United States in April 2013.  Accordingly, as the child was born and raised in Mexico prior to being brought to the United States, plaintiff has demonstrated that the child has a "degree of settled purpose"

in Mexico, and thus that Mexico was the child's habitual residence immediately before he was removed to the United States. *Jenkins*, 569 F.3d at 556.

## 2. Custody Rights

Turning next to whether the removal was in breach of plaintiff's custody rights pursuant to the laws of the child's habitual residence (Mexico), the Court finds that plaintiff has established by a preponderance of the evidence that he and defendant had joint custody rights over the child under Mexican law, and that he was actually exercising those custody rights prior to the child's removal.

Mexican law follows the doctrine of *patria potestas*, which is a "series of rights and obligations recognized by law to the parents . . . in relation to their children . . . in order to care for them, protect them, educate them and legally represent them" [Doc. 1-11 p. 1].[6] The Civil Code for the State of Queretaro, Mexico states that "parental authority/responsibility (*patria potestas*) is exerted by both parents" [Doc. 1-11 p. 2]. *See, e.g.*, *March*, 136 F. Supp. 2d at 842 (explaining the law of *patria potestas*, and finding that, as the natural father of the minor children involved in the dispute, the plaintiff's rights of custody arose by operation of Mexican law).

The parties cited to the relevant provisions of the Civil Code in their briefs. Article 400 states that "[w]hen both parents have claimed paternity over a child born out of wedlock and they live together, they will jointly exert parental authority/responsibility" [Docs. 1-11 p. 2; 18 p. 3]. Article 401 provides that "parental

---

[6] Both parties' briefs cite to the Mexican laws set out in Doc. 1-11, so the Court will similarly rely on this law.

13

authority/responsibility (*patria potestas*) is exerted by both parents. When due to any circumstance one of them ceases to exert it, it shall be exerted by the other one" [Doc. 18 p. 4]. Article 402 states that "[w]hen the parents of a child born out of wedlock that were living together separate and in case the parents cannot agree on the matter, the judge will designate which parent will exert parental authority/responsibility" [*Id.*].

As plaintiff and defendant had the child out of wedlock, and were living together before they separated, the Court will first consider whether Article 402 is applicable to the instant dispute.[7] Defendant alleges that this Article is applicable because she and plaintiff separated after the child was born out of wedlock. She submits that, as this Article states that the parental authority shall be determined in connection with Article 265, there is a preference for her to maintain custody [Doc. 18 p. 4].

Article 402 expressly calls for a judge to determine which parent will exert parental authority and responsibility pursuant to Article 265. Article 265 directs a judge overseeing a divorce decree on how to determine which parent will maintain custody of

---

[7] Defendant also states that Article 401 is applicable in the instant dispute, as plaintiff allegedly relinquished his rights of custody under Mexican law by throwing defendant and the child out of his house [Doc. 18 p. 4]. The Court disagrees with this assertion. Even after allegedly throwing defendant and the child out of his house, plaintiff maintained regular contact with the child, as he visited with him on four separate occasions in three weeks, including on one overnight visit. Plaintiff provided the child with support in the form of money and milk, even though defendant disputes the exact extent of this support. Plaintiff also submits that he and defendant had made a visitation agreement, even though defendant disputes this assertion. Even if plaintiff and defendant did not have an agreement regarding plaintiff's visitation with the child, the Court finds that plaintiff maintained regular contact and support for the child, thus demonstrating that he did not legally relinquish his parental authority over the child. *See, e.g.*, *Friedrich*, 78 F.3d at 1064 (agreeing with the district court's determination that the father did not end his parental rights as a matter of German law by placing the mother's and child's belongings in the hallway outside of their apartment).

14

the child, and contains a footnote that states that children under the age of seven will preferably stay in the mother's custody [*Id.* at 3]. The Court finds, however, that this Article is inapplicable to the instant dispute.

The Hague Convention and applicable Sixth Circuit case law are clear that this Court's role in ICARA proceedings is not to determine custody. *See, e.g.*, *Friedrich*, 78 F.3d at 1066 (stating that the ICARA rules leave "the full resolution of custody issues, as the Convention and common sense indicate, to the courts of the country of habitual residence"); *March*, 136 F. Supp. 2d at 837 (holding that "[u]nder the ICARA and the Hague Convention, custody and visitation rights are to be determined by the courts of the country that is the 'habitual residence' of the children"). There is no evidence in this case of a Mexican judicial determination regarding which parent will exert parental authority pursuant to Article 402 of the Civil Code for the State of Queretaro. As Article 402 simply dictates that when the parents separate, "the judge *will* designate" which parent will exert custody [Doc. 18 p. 4 (emphasis added)], but does not state what shall happen without a judicial designation, the Court finds that Article 402 is inapplicable to this dispute.

Without a judicial designation as to which parent will exert custody, the Court finds that Article 400 is most applicable to this case, as it pertains to parents who have both claimed paternity over a child born out of wedlock [Doc. 18 p. 3]. Even though plaintiff and defendant no longer live together, from the time the child was born and up until three weeks before the child was taken to the United States, they fit into Article 400.

15

This Article states that the parents will jointly exert parental authority and responsibility, and this is consistent with the general thrust of *patria potestas* under Mexican law, which calls for parents to jointly exert parental authority and responsibility. *See March*, 136 F. Supp. 2d at 842 (citing Antoinette Sedillo Lopez, *International Law—U.S./Mexico Cross-Border Child Abduction—The Need for Cooperation*, 29 N.M. L. REV. 289, 297 (Spring 1999) ("[b]y law, the right to patria potestad belongs to both parents, . . . Concurrence or agreement is not required. Historically, the father had superior rights of the patria potestad, but today it is a joint responsibility")). As plaintiff is the child's father, the Court finds he has proven by a preponderance of the evidence that, under Mexican law, both he and defendant have custody rights over the child.

Next considering whether plaintiff was actually exercising those custody rights prior to the child's removal, defendant argues that even if plaintiff had custody rights under Mexican law, he was not exercising those rights as he only visited with the child on four occasions in the three weeks after plaintiff and defendant separated—before the child was brought to the United States—and that he provided little support in the form of money or food to the child during that time [Doc. 18 p. 5].

As the Sixth Circuit has noted, the Hague Convention does not define "exercise." *Friedrich*, 78 F.3d at 1065. In *Friedrich*, the child's father only had a single visit with the child after he and the child's mother separated, and the father did not pay for or take care of the child during that period of separation. *Id.* The court found it to be "unwise" to attempt to determine whether those actions would be enough to amount to "exercise"

16

under the laws of the country of the child's habitual residence. *Id.* Rather, it stated that "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id.*

Plaintiff has not pointed to any Mexican ruling regarding this issue, and the evidence does not demonstrate that one exists. In the three week period of separation when the child was in Mexico, plaintiff visited with the child on four occasions, including one overnight visit. Plaintiff also provided defendant and the child with some degree of money and food support. The Court is satisfied that these actions demonstrate plaintiff sought to maintain regular contact with the child. *See id.* at 1066 (finding that, "as a general rule, any attempt to maintain a somewhat regular relationship with the child should constitute 'exercise.' This rule leaves the full resolution of custody issues . . . to the courts of the country of the child's habitual residence"). Accordingly, the Court finds that plaintiff has proven by a preponderance of the evidence that he was actually exercising his custody rights.

In sum, because the child habitually resided in Mexico and was removed to the United States, and plaintiff has succeeded in demonstrating by a preponderance of the evidence that he has custody rights and actually exercised those rights under Mexican law, plaintiff has met his burden in establishing that the child's removal was wrongful.

## B.    Statutory Defenses

In objecting to having her child returned to Mexico, defendant raises three statutory defenses under the Hague Convention and ICARA.  Defendant argues that (1) plaintiff acquiesced to the child being removed to the United States; (2) the child is now settled in the United States; and (3) that the child will be placed at grave risk if returned to Mexico [Doc. 18].

### 1.    Acquiesced to Removal

Defendant alleges that the child should not be returned to Mexico because plaintiff acquiesced to the child's removal to the United States by not filing the instant petition until nearly nineteen months after discovering the child's whereabouts online [Doc. 18 pp. 8–9].

Article 13(a) of the Hague Convention provides a statutory defense against the child being returned to the country of habitual residence if defendant proves by a preponderance of the evidence that plaintiff consented to or subsequently acquiesced in the child's removal or retention.  "Consent" and "acquiescence" are not defined in the Hague Convention, *see Friedrich*, 78 F.3d at 1069 n.11, but the Sixth Circuit has noted that "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id* at 1070 (finding that "[s]ubsequent acquiescence requires more than an isolated statement to a third-party" relating to the parent not seeking custody of the children).

18

Defendant submits that plaintiff has demonstrated a consistent attitude of acquiescence over a significant period of time because he waited almost nineteen months from when he first discovered defendant with the child on Facebook before filing the instant petition. Plaintiff disputes this assertion, stating that after the child went missing, he attempted to find defendant in Mexico by filing a police report within one month of the child's disappearance [Doc. 17 p. 10], and by seeking assistance from the Mexican government. Plaintiff also allegedly continued to search until he found a picture of the defendant in the United States. While plaintiff waited around nine months before filing an Application for Return of the Child with the Mexican Central Authority, plaintiff submits that he only filed this application "after he was unable to obtain assistance with the Mexican authorities" [*Id.* at 11]. Finally, soon after defendant learned where defendant was living with the child—after defendant filed a petition for custody of the child on May 28, 2015—plaintiff had the United States Department of State send a letter to the presiding judge, and filed the instant petition in December.

Upon review of the evidence presented, the Court finds that plaintiff's actions demonstrate that he was determined to find and obtain custody of the child soon after defendant disappeared with the child. Plaintiff's actions do not amount to a "consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070. Rather, they demonstrate that plaintiff actively sought custody of his child, through local and international channels, from the time the child disappeared through his filing the instant petition. Accordingly, defendant has not proved by a preponderance of the

19

evidence that plaintiff consented to or subsequently acquiesced in the child's removal or retention.

### 2. "Now Settled" Defense

Defendant maintains that the child should not be returned to Mexico because plaintiff initiated this proceeding more than one year after the child was removed from Mexico, and the child has become settled in the United States, pursuant to Hague Convention, article 12.

Article 12 of the Hague Convention states that when "a period of less than one year has elapsed from the date of the wrongful removal or retention," the court should order the child to be returned. Hague Convention, art. 12. When the proceedings have been commenced after one year from the wrongful removal, however, the court "shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." *Id.* To succeed in preventing the child's return under this exception, defendant must demonstrate by a preponderance of the evidence that the petition was filed more than one year after the child was removed, and that the child is now settled in his new environment. 22 U.S.C. § 9003(e).

When the Supreme Court recently considered Article 12 of the Hague Convention, it agreed with other circuit courts that had previously construed this exception as permitting—but not mandating—courts not to order the child back to the country of the child's habitual residence when this exception applies. *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224 (2014) (affirming *Lozano v. Alvarez*, 697 F.3d 41, 51–52 (2d Cir. 2012),

which held that the "settled defense merely permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency," but does not mandate it).[8]  *See also Yaman v. Yaman*, 730 F.3d 1, 13 (1st Cir. 2013) (agreeing with the Second Circuit's interpretation and stating that, "[e]ven if a child is found 'now settled,' an authority retains discretion to weigh against that finding of settledness considerations such as concealment before deciding whether to order return").  The Supreme Court held that:

> expiration of the 1–year period in Article 12 does not eliminate the remedy the Convention affords the left-behind parent—namely, the return of the child. . . . The continued availability of the return remedy after one year preserves the possibility of relief for the left-behind parent and prevents repose for the abducting parent.  Rather than establishing any certainty about the respective rights of the parties, the expiration of the 1–year period opens the door to consideration of a third party's interests, *i.e.,* the child's interest in settlement.

*Lozano*, 134 S. Ct. at 1234–35 (citations omitted).

The Supreme Court stated that the one-year period commences on the date the child was wrongfully removed or retained, pursuant to Article 12.  *Id.*  It noted that, to remedy the potentially harsh result of the one-year time period passing before the non-abducting parent finds the child, courts in the United States have "found as a factual matter that steps taken to promote concealment can also prevent the stable attachments that make a child 'settled.'"  *Id.* at 1236 (citing *Mendez Lynch v. Mendez Lynch*, 220 F.

---

[8]  In its opinion, the Supreme Court affirmed the Second Circuit's determination that equitable tolling is not available for the one-year filing period in the ICARA, abrogating decisions from the Ninth and Eleventh Circuits finding otherwise.  *Duarte v. Bardales*, 526 F.3d 563 (9th Cir. 2008); *Furnes v. Reeves*, 362 F.3d 702 (11th Cir. 2004).

Supp. 2d 1347, 1363–64 (M.D. Fla. 2002) (finding that the children were not settled when they lived in seven different locations in eighteen months); *In re Coffield*, 644 N.E. 2d 622, 666 (Ohio Ct. App. 1994) (finding the child not to be settled when the parent attempted to hide the child's identity by withholding the child from activities, including school)). The Supreme Court concluded that, as a result, extending the one-year period for filing suit until the date of discovery is "neither required by the Convention nor the only available means to advance its objectives." *Lozano*, 134 S. Ct. at 1236.[9]

One district court in this state considered the following factors in determining whether the child is now settled in his new environment: "the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the [defendant's] employment, and whether the child has friends and relatives in the new area." *Blanc v. Morgan*, 721 F. Supp. 2d 749, 763 (W.D. Tenn. 2010).

---

[9] Writing in concurrence in *Lozano*, Justice Alito, with whom Justices Breyer and Sotomayor joined, stated that Article 12 "places no limit" on the power that Article 18 grants courts to order the return of the child at any time. *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1237 (2014) (Alito, J., concurring). If a petition for return is filed after one year has passed, this "opens the door to consideration of . . . the child's interest in settlement," but "does not mean closing the door to evaluating all other interests of the child," and does not mean that the child's attachment to the new country "becomes the *only* factor worth considering when evaluating a petition for return." *Id.* (emphasis in original) (citation omitted). Among those other factors to be considered, any of which may outweigh the child's interest in remaining in the new country, are:

> the child's interest in returning to his or her original country of residence (with which he or she may still have close ties, despite having become settled in the new country); the child's need for contact with the non-abducting parent, who was exercising custody when the abduction occurred; the non-abducting parent's interest in exercising the custody to which he or she is legally entitled; the need to discourage inequitable conduct (such as concealment) by abducting parents; and the need to deter international abductions generally.

*Id.*

Defendant maintains that the instant petition was filed more than one year after the child was removed from Mexico to the United States and the child is now settled in the United States [Doc. 18 p. 7]. Defendant submits that the child has now lived in the United States for nearly three years, and that the child has little recollection of his life in Mexico [*Id.*]. Defendant states that the child has significant familial connections in the area, that he attends weekly church services, that he is becoming bilingual, and that he enjoys playing football, going to the park, jumping on a trampoline, skiing, and playing with members of his extended family [*Id.*; Tr. at 128:14–130:4]. Accordingly, defendant submits that the child is now settled in the United States.[10]

Plaintiff asserts that the child is not settled in the United States [Doc. 17 pp. 11–13]. He submits that the child does not attend school or day care, despite being five years old; that the child is living in the United States illegally; that the child and defendant are living at the child's uncle's house and not in their own home; that each of the child's preferred activities are available in Mexico; and that the child has family in Mexico [*Id.*].

The Court first finds that defendant has proven by a preponderance of the evidence that the child was removed from Mexico to the United States over one year ago, as the child was removed in April 2013, and the instant petition for return was not filed until December 11, 2015. Accordingly, the Court will now consider whether the child is now

---

[10] In her brief, defendant relies on *Robert v. Tesson*, 507 F.3d 981 (6th Cir. 2007) for the proposition that a "change in geography and the passage of time" may establish a new habitual residence for the child. Defendant submits that these factors support a finding that the child is now settled in the United States. The Court notes, however, that *Robert* pertains to how a child may establish a new habitual residence, which is part of plaintiff's prima facie case, rather than to how defendant may satisfy the statutory "now settled" exception.

settled in the United States, thus weighing against a finding that the child should be returned to Mexico.

In analyzing the factors that the Supreme Court and other district courts have considered under this exception, the Court notes that many weigh both for and against a finding that the child is now settled in the United States. Even though the child attends church each week, he does not attend school or day care consistently in the United States, despite being over five years old. While the child has extensive maternal familial connections in the Knoxville area, he also has extensive paternal (and some maternal) familial connections in Mexico. As for where the child has spent most of his life, the Court notes that he is only five years old and has spent approximately half of his life in Mexico and half in the United States. Most of the child's preferred activities in the United States are ones in which he could participate in Mexico, including playing football, going to the park, jumping on a trampoline, and playing with members of his extended family.

Furthermore, the child is not at such an age where moving him back to Mexico would disrupt his development or maturation. He can attend school and church, be surrounded by extended family, and maintain his same interests in Mexico, as in the United States. *See, e.g.*, *Blanc*, 721 F. Supp. 2d at 764 (finding that the mother did not carry her burden in demonstrating that the child is now settled in the United States when the child had developed bonds with family members in the United States, lived in a stable home, and regularly attended day care and summer camps, as the evidence did not show

24

that the child was "so extensively involved in activities" or that she had developed such connections with her community that she would suffer an undue disruption if returned).

The Court also recognizes the strong need for the child to have contact not only with defendant but also with plaintiff, who was exercising custody prior to the child's removal. Plaintiff's interest in exercising his custody rights also weighs in favor of returning the child to Mexico. Finally, there is a great interest in seeking to deter child abductions generally, which weighs against finding the child is now settled in the United States. Upon review of these factors, the Court finds that defendant has not met her burden of demonstrating by a preponderance of the evidence that the child is now settled in his new environment.[11]

### 3. Grave Risk

Defendant also asserts that the child should not be returned to Mexico because there is grave risk that returning the child would expose him to harm, pursuant to Hague Convention, Article 13(b).

---

[11] The Court did not hear from the child as to his wishes, despite defendant alleging that the child does not have many memories from his time in Mexico, as the parties agreed not to inform the child of these proceedings. Even if the Court were to presume that the child enjoys living close to his maternal relatives in the United States, it is not the Court's role to determine where the Court thinks the child would be happiest or where he would lead the best life. *See, e.g.*, *Friedrich*, 78 F.3d at 1068 (finding that, in the context of the grave risk exception but equally applicable here, the court is not to debate the virtues of what each country has to offer, and that the exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest," as that is intended to be considered in the custody hearing). Rather, the Court must determine whether defendant has proven by a preponderance of the evidence that the child is now settled in the United States, taking into consideration the child's wishes as a factor among others.

For the "grave risk" exception to apply, defendant must demonstrate by clear and convincing evidence that there is a grave risk that returning the child to Mexico "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The Sixth Circuit has adopted a "restrictive reading" of this exception, and states that a grave risk of harm can only exist in two situations:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich*, 78 F.3d at 1068–69 (emphasis in original) (finding "[t]here is nothing in the record to indicate that life in [the return country] would result in any permanent harm or unhappiness" to the child and thus there was no grave risk of harm, as the child's father did not work "long hours" and the child's grandmother could care for the child when the father was at work); *see also March*, 136 F. Supp. at 844–846 (stating that "this exception is truly to be narrowly construed," and finding that those cases that have denied return due to a grave risk "have generally emphasized that there was clear and convincing evidence to support a finding that the parent seeking the return had seriously abused the child").

The Circuit continued by stating that, when considering if the child would be subject to danger in the return country, "we can expect that country's courts to respond

26

accordingly. . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate." *Friedrich*, 78 F.3d at 1068 (citing *Nunez-Escudeo v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) (reasoning that if the parent in Mexico is abusive, the infant child can be institutionalized in Mexico during the custody determinations)). *See also March*, 136 F. Supp. 2d at 855 (finding that defendants "have not pointed to any action by the Mexican government or the courts that demonstrates that they would be denied due process of law or would be denied a fair trial if the children are returned to Mexico," or that "the rights of the minor children[ ] would not be protected in Mexico," so there was no grave risk of harm).

In the instant petition, defendant alleges that returning the child would place the child in an "intolerable situation" [Doc. 18 p. 9]. She alleges that defendant has problems with alcohol, that he did not play an active role in parenting the child, and that she would fear for her safety if she returned to Mexico, as defendant's family has "wealth and power" [Doc. 18 p. 9]. Plaintiff submits, on the other hand, that there are no allegations that the child suffered serious abuse or neglect, or that the child has an "extraordinary emotional dependence" on defendant [Doc. 17 p. 14]. Plaintiff states that he testified that he does not have a problem with alcohol, and that defendant's testimony regarding that issue should be discounted [*Id.*].

Upon review, the Court finds that defendant has not proven by clear and convincing evidence that returning the child to Mexico "would expose the child to

physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). While defendant alleges that she is fearful to return to Mexico, she has not proven by clear and convincing evidence that there is a grave risk of harm that returning the child to Mexico would either place him in danger prior to resolution of a custody hearing or subject him to serious abuse or neglect from plaintiff.

While defendant submits that plaintiff had an alcohol problem and abused her in the past, she does not allege that plaintiff abused the child. Defendant also allowed plaintiff to visit with the child multiple times when they were separated, and testified that plaintiff supported the child with food and money during the period of separation, both of which tend to show that plaintiff would not subject the child to serious abuse or neglect if the child were returned to Mexico. Additionally, to the extent defendant alleges that plaintiff is a poor parent, this is a matter best resolved in the custody hearing, and the allegations of poor parenting do not rise to such a level for the Court to find a potentially grave risk of harm to the child. *See, e.g.*, *Friedrich*, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence.")

Additionally, while defendant submits that plaintiff's family is wealthy and powerful, she has not proven by clear and convincing evidence that the Mexican courts would be unwilling or incapable of protecting the child during the pendency of a custody hearing, or that she would be denied due process of law for a custody hearing in Mexico.

28

The Court, therefore, cannot find that defendant has carried her burden of establishing by clear and convincing evidence that there is a grave risk to her child if the child is returned to Mexico.

## III.    Conclusion

For the reasons stated herein, the Court will **GRANT** plaintiff's petition for the return of his child to Mexico [Doc. 1].  As the Court has found that Mexico was the place of the child's habitual residence prior to his removal to the United States, that plaintiff was actually exercising his custodial rights prior to that removal, and that defendant is not entitled to relief under any of the narrow exceptions permitted under ICARA and the Hague Convention, the Court concludes that the child must be returned to Mexico to allow Mexican courts to determine who shall have custody of the child.  This finding is consistent with the primary aims of the Hague Convention, which aims to restore the "pre-abduction status quo," and deter child abductions generally.  *Panteleris*, 601 F. App'x at 347.  The Court reiterates that this decision does not address the underlying merits of who should be entitled to custody of the child.  The parties are to decide among themselves the means and manner of the child's return to Mexico.

This case will be **DISMISSED**.  The Clerk will be **DIRECTED** to close this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE